UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

JOSEPH WEINFELD et al.,

    Plaintiffs,

vs.

BILL L. MINOR et al.,

    Defendants.

3:14-cv-00513-RCJ-WGC

ORDER

This is a shareholder derivative action. Pending before the Court are countermotions for summary judgment.

I.    **FACTS AND PROCEDURAL HISTORY**

Sixteen individuals and Congregation Beth Joseph brought this shareholder derivative action in the Eastern District of New York on behalf of Precious Minerals Mining & Refining Corp. ("PMMR") against Bill Minor, John Reynolds, and Walter Marting for breach of fiduciary duties, unjust enrichment, abuse of control, usurpation of corporate opportunities, and ultra vires actions. PMMR is a Nevada corporation holding certain mining rights in Lyon County, which it exercises under permission of the U.S. Forest Service ("USFS") (which owns the relevant land) to mine a substance sold commercially as Orykta and used as fertilizer and animal feed. (Third Am. Compl. ¶ 1, ECF No. 54). From 1999 to 2001, Minor sold shares of PMMR to investors

throughout the United States and Canada, including Plaintiffs, who are New York residents. (*Id.* ¶¶ 3, 31).

Minor used PMMR "as his own personal piggybank," selling Orykta to only one customer in Costa Rica over a 14-year period. (*Id.* ¶ 5). Minor repeatedly misrepresented PMMR's prospects to shareholders, including lying about a nonexistent imminent contract with China, in order to deflect scrutiny, and he refused to entertain sales leads from them, even threatening bodily harm when they made suggestions. (*Id.* ¶¶ 6–7, 49–64). Minor has used a fraudulent stock transfer document purporting to transfer non-existent shares to himself in order to falsely portray himself as a majority shareholder. (*Id.* ¶¶ 69–73). Minor made false promises of dividend distributions in order to deflect questions about the viability of PMMR. (*Id.* ¶¶ 74–76).

All Defendants consistently failed to provide basic information about PMMR to shareholders, with Minor even threatening bodily harm when they made requests. (*Id.* ¶ 9). Defendants have not produced an audited financial statement since 1995 and have produced only one unaudited financial statement from the fourth quarter of 2009. (*Id.* ¶ 10). Defendants failed to properly file for various business permits and to file correct tax returns, jeopardizing the corporation's legal status. (*Id.* ¶¶ 11–13). The failure of Defendants to maintain compliance with the USFS's terms of permissible activities has resulted in a criminal and civil investigation of PMMR. (*Id.* ¶¶ 53–57).

Although PMMR obtained approximately $15–20 million from the sale of its stock to shareholders, it has never made a profit and has failed to account for these funds. (*Id.* ¶¶ 78, 80). Rather, Defendants have simply awarded themselves large compensation packages and paid themselves large consultancy fees. (*Id.* ¶ 78). Minor also paid for his son's flying lessons using PMMR's assets. (*Id.* ¶ 79).

Minor abused his control of PMMR by treating PMMR's assets as his own and transferring PMMR's assets into his own name, i.e., the title of at least one of PMMR's mining claims was transferred into Minor's name from 2007–2010. (*Id.* ¶¶ 81–83). At various times, Minor transferred mining claims between himself and PMMR to suit his personal needs. (*Id.* ¶ 84). Defendants have usurped corporate opportunities by selling Orykta through a company named Wrightsville Fertilizer Co. ("WFC"); Plaintiffs deduce this from the fact that there is no evidence WFC ever paid PMMR to purchase Orykta. (*Id.* ¶ 85). Defendants have engaged in ultra vires actions by issuing stock, stock options, and rights without shareholder approval, thereby diluting the value and control of existing shareholders. (*Id.* ¶ 86).

The U.S. District Court for the Eastern District of New York transferred the case to this District under 28 U.S.C. § 1404(a) as an alternative to a request to dismiss for lack of personal jurisdiction and improper venue. The transferor court did not rule on contemporaneous requests to dismiss the First Amended Complaint ("FAC") for failure to comply with Rules 8(a), 9(b), and 23.1(b). This Court dismissed the FAC under the latter rule and Rule 11(a) because it was not verified or even signed by any attorney. Plaintiffs filed the Second Amended Complaint ("SAC"), and Defendants moved to dismiss it. The Court ruled that the SAC was not precluded by either of two previous actions litigated in the New York and Nevada state courts but dismissed it with leave to amend because it failed to comply with Rule 23.1's requirement to plead demand or futility with particularity.

Plaintiffs filed the Third Amended Complaint ("TAC"), and Defendants moved to dismiss it. The Court refused to dismiss the TAC under Rule 23.1 but dismissed certain claims on the merits, with leave to amend some of them. Specifically, the Court permitted the claim for breach of fiduciary duty to proceed against all Defendants as to the allegations concerning usurpation of corporate opportunities and compensation packages and permitted the claim to

proceed against Minor as to the allegations concerning false statements and improper withholding of financial records. The Court otherwise dismissed the breach of fiduciary duty claim, as well as the claims for unjust enrichment and abuse of control, without leave to amend, and dismissed the claim for ultra vires acts, with leave to amend. Plaintiffs did not further amend. Defendants answered and filed counterclaims for intentional interference with contractual relations ("IICR") and intentional interference with prospective business relationship ("IIPBR") based on: (1) Plaintiffs' alleged communications to WFC and China National Seed Group Corporation Limited, a division of Sinochem ("China National"); (2) their interference with potential distribution contracts between PMMR and companies in China, Vietnam, the Philippines, and Costa Rica; and (3) having filed various lawsuits against Defendants. The parties have now filed cross motions for summary judgment.

## II. SUMMARY JUDGMENT STANDARDS

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court uses a burden-shifting scheme. The moving party must first satisfy its initial burden. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and internal quotation marks

omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.

If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

Notably, facts are only viewed in the light most favorable to the nonmoving party where there is a genuine dispute about those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). That is, even if the underlying claim contains a reasonableness test, where a party's evidence is so clearly contradicted by the record as a whole that no reasonable jury could believe it, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

III. ANALYSIS

    A. **Plaintiffs' Claims**[1]

        1. **Usurpation of Corporate Opportunities (Minor, Reynolds, Marting)**

This claim is based upon Defendants' alleged sale of PMMR's Orykta through their separate company, WFC. Plaintiffs appear to allege that Defendants did not sell Orykta from PMMR to WFC as a distributor or retailer, but that they made sales of Orykta that properly belonged to PMMR directly from WFC to distributors, retailers, or consumers, such that PMMR received nothing for it. Such a claim, if true, could constitute a breach of the "fiduciary duty of loyalty." *See In re Amerco Derivative Litig.*, 252 P.3d 681, 701 (Nev. 2011) (holding that a plaintiff had sufficiently made out such a claim by alleging that an officer who owned and controlled other entities had caused the defendant corporation to sell property to those other entities at below market prices and had caused those other entities to purchase properties that the defendant corporation would have been interested in without first obtaining disinterested director approval). If Defendants were interested in WFC as officers, owners, or otherwise, and if they caused the sale of Orykta by WFC where PMMR was a competitor for the business of the buyer(s), Defendants may have violated the duty of loyalty to PMMR, regardless of whether the

---

[1] Defendants are correct that any claims that have not been pled, that have been dismissed without leave to amend, or that have been dismissed with leave to amend but which were not amended are not part of the case and therefore need not be addressed.

Orykta that was sold by WFC in fact belonged to PMMR (although that would of course aggravate such a violation).

Only Defendants have moved for summary judgment on this claim. They adduce evidence that PMMR sent a single shipment of Orykta to WFC for WFC to sell on behalf of PMMR in an effort to develop the market. (*See* Ex. 21, Minor RFA Responses 21:17–21, ECF No. 134, at 117; Ex. 52; *see also* WFC Business Plan, ECF No. 138, at 141). The venture was unsuccessful, but the shipment of Orykta to WFC was on behalf of PMMR, not a usurpation of its opportunities. Plaintiffs do not address this claim in response. Because Defendants have satisfied their initial burden by presenting evidence which if unrebutted would negate a claim of usurpation, and because Plaintiffs have adduced no contrary evidence in response, the Court grants summary judgment to Defendants against the usurpation claim.

2. **Compensation Packages (Minor, Reynolds, Marting)**

Defendants argue there is no evidence for the claim that Defendants breached their fiduciary duty to PMMR by overpaying themselves. Defendants note there is a statutory presumption of fairness in director compensation established by a board of directors that Plaintiffs must disprove by a preponderance of the evidence. *See* Nev. Rev. Stat. § 78.140(5). "A director breaches his or her fiduciary duty to the corporation by taking excess salaries." *Bedore v. Familian*, 125 P.3d 1168, 1173 n.24 (Nev. 2006) (citing *Gascue v. Saralegui L. & L. Co.*, 255 P.2d 335, 336 (Nev. 1953)). Defendants also argue that Plaintiff have no expert evidence as to customary pay for directors in the mining industry. Although such evidence would be useful, it is not necessary. In an extreme case, a layperson can properly assess without expert evidence whether compensation is excessive in relation to a company's profits or assets in derogation of a duty to shareholders, even assuming the standard sounds in corporate waste, as Defendants argue, i.e., that the compensation must be "unconscionable" or "so one sided that no

business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 362 (Del. Ch. 1998), *aff'd in part by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *Brehm*, 746 A.2d at 263.

Whatever the standard, however, Plaintiffs have adduced no evidence to create a triable issue of material fact on this issue. Indeed, they have not addressed the claim in their response. Because Defendants have satisfied their initial burden by pointing out a lack of evidence for the claim, and because Plaintiffs have not responded with any evidence, Defendants are entitled to summary judgment.

### 3. False Statements (Minor)

#### a. The Contract to Sell Orykta in China

Defendants argue that Plaintiffs' claim that Minor lied about the existence of a contract to sell Orykta in China is a fraud claim by the individual Plaintiffs against Minor, not a derivative claim of PMMR, because the alleged harm is the putative loss to stockholders by having been fooled into retaining PMMR stock, not any damage to PMMR itself. Defendants also adduce evidence that PMMR entered into a Cooperation Agreement with Conti-Beijing Agriculture Biotechnology Co., Ltd. ("Conti")) on June 2, 2004 to develop a market for and sell Orykta in China. (*See* Ex. 18, Cooperation Agreement, ECF No. 136, at 236). The Cooperation Agreement indicates that Conti would attempt to obtain a registration for Orykta in China and promote and sell it within China. (*See id.*). The Cooperation Agreement is signed by a representative of Conti (in Chinese). A December 2009 Cooperation Letter is also attached indicating an agreement between PMMR and China National Seed Group Co., Ltd. ("China National"). (*See* Ex. 19, Cooperation Letter, ECF No. 137, at 6). The Cooperation Letter indicates that PMMR had received a permanent license from China's Department of Agriculture to sell Orykta as a fertilizer in China. (*See id.*). The Cooperation Letter is a nonbinding indication of the parties'

intent for China National to buy between 200,000 and 1.5 million tons of Orykta from PMMR per year (according to a defined schedule) for 10 years in exchange for the exclusive right to distribute Orykta in China for the 10-year period. (*See id.*). Defendants also argue that Plaintiffs admitted in their depositions that they have no evidence Minor made any false representations concerning a contract to sell Orykta in China. In opposition, Plaintiffs argue that the Cooperation Agreement is only an agreement to obtain a registration for Orykta in China and to test it, that the Cooperation Letter is non-binding by its own terms, and that there is no evidence any binding contract was ever entered into.

There is a genuine issue of material fact whether there was any actual contract to sell Orykta in China. But the Court must grant summary judgment to Minor against a fraud-type claim, because there is no evidence adduced that Minor ever made any false statements to any Plaintiff, directly or indirectly, concerning any contract to sell Orykta in China. Minor adduces excerpts of several of Plaintiffs' depositions showing a lack of evidence for such a claim. (*See* Weinfeld Dep. 29:16–24, 56:21–57:11, ECF No. 134, at 133 (testifying that he had never heard of PMMR's business opportunities in China, India, or Malaysia and that he simply signed his answers to Defendants' interrogatories at the direction of his attorney, although he did not have personal knowledge of the answers); Weiss Dep. 23:5–8, 51:10–20, 83:12–23, ECF No. 134, at 180 (testifying that he had never spoken to Minor and did not know if PMMR had undertaken efforts to sell Orykta in China but had heard a "rumor" about it); Isaac Dep. 18:20–22, 44:1–4, 53:4–55:10, ECF No. 134, at 210 (testifying that he had never spoken to Minor, had no personal knowledge of evidence to support his claims or the state of PMMR's efforts to distribute Orykta in China, and that he had only ever received relevant information from a "Mr. Rydel," although he couldn't remember what Rydel had told him except that it had to do with PMMR being in good financial health); Rubin Dep. 25:14–18, 66:1–19, ECF No. 135, at 6 (testifying that he had

never spoken to Minor but that a "Mr. "Reidel" had told him something about future contracts to sell Orykta in China as fertilizer); Steinmetz Dep. 20:5–25, 22:3–5, ECF No. 135, at 35 (testifying that he never spoke with Minor or anyone from PMMR); Frank Dep. 22:20–23:11, , ECF No. 135, at 63 (testifying that he never spoke with Minor or anyone from PMMR, that no one had ever made false representations to him on behalf of PMMR, and that the only information he had supporting any of the claims was based on hearsay from other shareholders, the nature of which he couldn't even remember)).

Plaintiffs adduce no contrary evidence in opposition—not a single self-interested attestation that Minor ever made any statement to any of them concerning the sale of Orykta in China, and no evidence that any such statements were materially false. The only evidence cited in Plaintiffs' own motion for summary judgment are excerpts of Minor's deposition wherein he attested that PMMR had a letter of intent from China National and a contract with them. (*See* Minor Dep. 93:15–20, 101:10–19, ECF No. 139-10).[2] That is no evidence that no contract exists or that Minor had knowingly misrepresented that a contract existed. The Court must grant summary judgment against a breach of fiduciary duty claim based on alleged false statements under these circumstances, whether the statements are intended to form the basis of a shareholder derivative claim against PMMR or a fraud claim against Minor directly.

b.  **The Intent to Pay Dividends**

Minor argues there is no evidence he ever stated his intent for PMMR to pay Plaintiffs dividends, and that such a statement could not be justifiably relied upon even if made. Minor adduces excerpts of several of Plaintiffs' depositions showing a lack of evidence that he ever

---

[2] Defendants argue that certain of Plaintiffs' exhibits, including the excerpt of Minor's deposition, are not properly authenticated and therefore cannot be considered. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). The Court needn't address this issue, because Minor's deposition does not prevent summary judgment for Defendants even if admitted.

made or caused anyone to make false statements concerning an intent to pay dividends. (*See* Minor Resp. to Req. for Adm. 26:1–4, ECF No. 134, at 117 (denying promising shareholder dividends); Weinfeld Dep. 30:19–21, 56:15–20 (testifying that no one promised dividends on behalf of PMMR); Knijnikova Dep. 66:1–3, ECF No. 124, at 159 (same); Weiss Dep. 23:5–8, 60:12–17, 83:8–11 (admitting that he never spoke to Minor and could not remember anyone ever promising dividends); Isaac Dep. 18:20–22, 35:8–21 (testifying that he had never spoken to Minor and had no idea why he hadn't earned any return on his investment, if indeed he hadn't); Rubin Dep. 67:14–25 (testifying that he could not recall whether Mr. Reidel or anyone else from PMMR made any representations concerning dividends); Steinmetz Dep. 22:11–14, (testifying that he "[did] not think" anyone from PMMR represented that shareholders would receive a dividend); Frank Dep. 22:20–23:11, 43:17–22 (testifying that he never spoke with anyone from PMMR and that no one from PMMR or on its behalf ever made false representations to him of any sort)).

  Without addressing whether a false statement about an intent to pay dividends could be justifiably relied upon, the Court grants summary judgment against this claim because Defendants have shown a complete lack of evidence to support it, and Plaintiffs have not adduced any evidence in response that any false statements promising to pay dividends were made. In opposition, Plaintiffs claim that on or about February 23, 2012, Minor promised Mr. Moses Wolf that PMMR would pay dividends at the end of the year, citing paragraph 74 of the TAC. But Plaintiffs do not attach or point to any supporting evidence in opposition, and none of their exhibits in support of their own motion for summary judgment appears to include any attestation by Mr. Wolf. (*See* Ex. List, ECF No. 139, at 20). The TAC itself is verified, but only as to the personal knowledge of each signatory, and Mr. Wolf is not a signatory. He does not appear to ever have been a Plaintiff.

c.  **Minor's Majority Shareholder Status**

Minor argues that there is no evidence he was not the majority shareholder of PMMR at the relevant time, so any statement he may have made to that effect cannot have been fraudulent. Minor adduces evidence that he has been the majority stockholder in PMMR since 2008, in any case. He adduces evidence that he purchased 3 million shares from Joe Wilson and nearly 1.5 million shares from Ivan Johnson. PMMR paid Wilson and Johnson a total of about $500,000 for the shares and transferred the shares to Minor in exchange for Minor's forgiveness of $550,000 in debt owed to Minor by PMMR. In summary, Minor obtained about $500,000 worth of PMMR's stock in satisfaction of PMMR's $550,000 debt to him (losing about $50,000 in value but obtaining control of the company), Wilson and Johnson obtained about $500,000 for their stock, and PMMR satisfied a $550,000 debt for about $500,000 (gaining about $50,000 in value). Defendants make arguments concerning alleged irregularities in the way Minor obtained the stock, but they provide no evidence that Minor was not the majority shareholder at the time he made any relevant statements. Nor do Plaintiffs point to any alleged statements by Minor concerning his majority shareholder status at all, identify to whom he made any such statements, or show how they relied on those claims to their detriment, or, critically in the context of the present shareholder derivative claim, show how those alleged statements harmed PMMR. The Court grants summary judgment to Minor on this claim.

d.  **Misrepresentations of PMMR's Sales**

Plaintiffs allege that the only financial statement they have ever received is one for the fourth quarter of 2009 ("the Statement"). (Third Am. Compl. ¶ 44). The Statement indicates no sales for the fourth quarter of 2009. (*Id.* ¶ 45). But Minor mailed investors shareholder updates ("the Updates") sometime in 2009 and in the fourth quarter of 2010 indicating that PMMR was "continuing" to ship approximately one container of Orykta per month to Costa Rica. (*Id.* ¶ 46).

Plaintiffs argue that the Statement (showing no sales for the fourth quarter of 2009) is evidence that the Updates indicating continuous shipments to Costa Rica were false. Minor argues that the evidence he has adduced confirms any statements he made about PMMR's sales, that the fourth quarter 2009 financial statement Plaintiffs rely on to show fraud cannot have been justifiably relied upon, and that Minor had no role in generating that statement, in any case.

Minor adduces Exhibits 40–49 to show sales of Orykta in 2009. There is evidence showing sales of Orykta in the second quarter of 2009. (*See* Purchase Orders, ECF No. 138, at 98 (indicating sales of 40,000 pounds of Orykta to Laboratorios Faryvet S.A. on April 25, 2009 and June 10, 2009); Emails, ECF No. 138, at 134; Invoice, ECF No. 138, at 137). There is also evidence of a deposit into PMMR's bank account of $6,982 by Faryvet S.A. during the second quarter of 2009. (*See* Bank Statement, ECF No. 138, at 118). There is evidence of additional deposits into PMMR's bank account of $7,200 and $7,000 during the second quarter of 2009, with written annotations that they were attributable to "sales." (*See* Bank Statement, ECF No. 138, at 122). There is evidence of a deposit into PMMR's bank account of $160 during the third quarter of 2009, with a written annotation that it was attributable to "sales." (*See* Bank Statement, ECF No. 138, at 114). There is evidence of deposits into PMMR's bank account totaling $371,167.93 during the fourth quarter of 2009 and first quarter of 2010, with a written annotation that $167.93 was attributable to "sales," and the remainder due to a stock purchase by "Smith." (*See* Bank Statement, ECF No. 138, at 110). There is evidence of a deposit into PMMR's bank account by Faryvet S.A. during the second quarter of 2010, which is indirect evidence of a sale of Orykta during that quarter. (*See* Bank Statement, ECF No. 138, at 106).

This evidence appears to show three 20-ton containers sold in the second quarter of 2009 with perhaps some minor sales for samples or something during the following year. Minor adduces an Update that claims shipments of one container a month of Orykta to Central America.

(*See* Update, June 17, 2009, ECF No. 135, at 85 ("In Central America, the Company continues to ship Orykta to organic growers in the region with volumes averaging about one container load (20 tons) per month.")). That was true in June 2009 according to the evidence adduced. Although it is true Minor has adduced evidence of only three container sales in early 2009, Plaintiffs adduce no evidence of any statements by Minor claiming more sales than that, whether by email update or otherwise. In their response, they do not even claim that such evidence exists, pointing only to the June 2009 Update and complaining that sales stopped thereafter. But there is no evidence adduced that Minor made any statement thereafter claiming that container sales had continued. If Plaintiffs adduced a later statement by Minor indicating continuing monthly container sales to Central America, there would be a genuine issue of material fact as to whether the statement was false given the current lack of evidence of any such sales after the second quarter of 2009, but Plaintiffs adduce no such statement. Minor is entitled to summary judgment against this claim.

### 4. Improper Withholding of Financial Records (Minor)

Defendants argue that under Nevada law Plaintiffs had no right to the financial records they claim to have been wrongly denied access to. The relevant statute entitles any person who owns at least 15% of outstanding shares and who makes a written demand to inspect the financial and accounting records of a corporation during normal business hours, to make copies, and to conduct an audit. *See* Nev. Rev. Stat. § 78.257(1). Defendants argue that Plaintiffs have no evidence that any of them who individually or collectively owned 15% of shares of PMMR ever made any written demand to inspect PMMR's records. The Court need not examine percentages of share ownership unless there is some evidence of a written demand. If so, the Court must

decide whether there is any evidence that those who made the demand owned at least 15% of PMMR's shares at the time they made the demand.[3]

Defendants cite six Plaintiff depositions for admissions as to a lack of any written demand. Plaintiffs produce no evidence to the contrary and do not claim the requirements of the statute were satisfied. They simply argue that the statute should not apply. But they do not argue why they think it does not apply on its face. Nor do they argue legislative intent in any meaningful way, e.g., differences between earlier and later versions of the statute and/or legislative commentary. They use the words "intent of this statute" but simply make conclusory statements about the bad effect of interpreting the statute as it is written, e.g. "such a reading of the statute [a plain one] will only act to drive away businesses from Nevada as no investor will want to invest in any corporation or state that tells them up front that they are not entitled to receive financial information about their investments." Even if this were the issue—and it is not—the Court disagrees. Investors in Nevada corporations are protected by a myriad of federal and state laws and regulations concerning financial information disclosures by corporations to the public and to shareholders. The present statute is one such law. There is nothing bizarre about 15%-ownership and written-demand requirements before a corporation must allow shareholders to go rummaging through file cabinets in corporate offices. Plaintiffs are free to try to convince the Nevada Legislature to change the requirements, but the Court cannot rewrite the statute judicially. It clearly applies here, and Plaintiffs clearly have no evidence that they satisfied it. The Court is bound to grant summary judgment against this claim.

///

///

---

[3] There may be a material dispute over the validity of the issuance of certain shares. If so, the Court must resolve that issue in favor of the non-moving party at summary judgment.

### 5. New Claims

Plaintiffs argue for offensive summary judgment as to several claims that do not appear in the TAC. The Court expresses no opinion as to the merits of such claims or their timeliness under the relevant statutes of limitations. The claims are not pled in the TAC, and the Court will not permit further amendment in the present case at this late stage.

### B.  Defendants' Counterclaims

"In an action for intentional interference with contractual relations, a plaintiff must establish: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003) (footnote omitted). Similarly, the tort of IIPBR requires proof of:

> 1) a prospective contractual relationship between the plaintiff and a third party; 2) the defendant's knowledge of this prospective relationship; 3) the intent to harm the plaintiff by preventing the relationship; 4) the absence of privilege or justification by the defendant; and, 5) actual harm to the plaintiff as a result of the defendant's conduct.

*Leavitt v. Leisure Sports Inc.*, 734 P.2d 1221, 1225 (Nev. 1987). Plaintiffs argue that Defendants have not identified any Plaintiff who allegedly interfered with PMMR's existing or prospective contracts. Plaintiffs note that Minor and Reynolds admitted at their depositions that they did not know who may have made any alleged harassing calls to potential distributors or interfered with PMMR's website. Defendants admit in response that they have no evidence that any Plaintiff was involved in the alleged interference. The Court will therefore grant summary judgment against the counterclaims.[4]

---

[4] Plaintiffs also argue that the counterclaims do not arise "out of the same transaction or occurrence" as Plaintiffs' claims. But even assuming that is true, that only means that Defendants needn't bring the counterclaims, not that they can't. Counterclaims that "arise[] out of the transaction or occurrence that is the subject matter of the opposing party's claim" are

## CONCLUSION

IT IS HEREBY ORDERED that the Motion for Summary Judgment (ECF No. 133) is GRANTED.

IT IS HEREBY ORDERED that the Motion for Summary Judgment (ECF No. 139) is GRANTED IN PART AND DENIED IN PART. The Court grants defensive summary judgment in favor of Plaintiffs against the Amended Counterclaim and denies partial offensive summary judgment on Plaintiffs' claims.

IT IS FURTHER ORDERED that the Clerk shall enter judgment and close the case.

IT IS SO ORDERED.

Dated this 26th day of MARCH, 2018.

_____
ROBERT C. JONES
United States District Judge

---

compulsory, *see* Fed. R. Civ. P. 13(a)(1)(A), but a defendant may permissibly plead "any claim that is not compulsory," *see* Fed. R. Civ. P. 13(b).